IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

WENDELL HARRIS, *as Administrator of the*
*Estate of LaFerre Washington Harris, Deceased,*
*and on behalf of LaFerre Washington Harris,*

       Plaintiff,

    v.                                                    No. 2:19-cv-02397-JTF-jay

MIDTOWN CENTER FOR HEALTH AND
REHABILITATION, LLC, and
MC CONSULTING, LLC,

       Defendants.

---

AMENDED REPORT AND RECOMMENDATION ON
DEFENDANT'S RENEWED MOTION TO COMPEL ARBITRATION

---

Before the Court is the renewed motion of Defendant, Midtown Center for Health and

Rehabilitation, LLC ("Midtown"), to compel arbitration. (Docket Entry ("D.E.") 63; D.E. 64.)

Plaintiff, Wendell Harris ("Wendell"), submitted a response in opposition, (D.E. 67), to which

Defendant filed a reply, (D.E. 68). This matter was referred to the undersigned on September 18,

2020, for report and recommendation and/or determination. (D.E. 82.) On February 10, 2021, the

undersigned held a hearing on Midtown's motion. (D.E. 99.) Accordingly, this matter is ripe for

disposition.

## BACKGROUND

On October 10, 2017, LaFerre Harris ("LaFerre" or "Decedent") was admitted to

Defendant's nursing home facility in Memphis, Tennessee. At the time Decedent was admitted,

Signature HealthCARE at St. Peter Villa ("SHC") owned and operated the facility. As part of the

admission process, the facility required residents or their authorized representative to sign certain

admission documents, including a separate dispute resolution agreement that is at issue here. LaFerre's wife, Mavis Harris ("Mavis"), purportedly signed these agreements on behalf of her husband.  In January 2018, SHC entered into an Operations Transfer Agreement ("OTA") with Midtown, which assigned operational control of the facility to the latter.  Subsequently, SHC and Defendant executed a Bill of Sale and an Assignment and Assumption Agreement, which conveyed certain assets and liabilities to Defendant, including the name of the facility, inventory, occupancy agreements, records, and contracts.[1]  Decedent remained a resident at the facility until August 16, 2018, at which time he was transferred to a local hospital.  LaFerre died in the hospital nine days later.

On May 23, 2019, Plaintiff initiated this health care liability action in state court alleging that Midtown and MC Consulting, LLC, are liable for the death of his father under Tennessee's Health Care Liability Act.  (D.E. 1-2.)  Defendants timely removed this action to this Court on June 19, 2019, (D.E. 1), and filed a motion to compel arbitration two days later, (D.E. 11).  Subsequently, Midtown and MC Consulting filed a motion to conduct discovery on this issue of arbitration.  (D.E. 16.)  The Court granted Defendants' discovery request and denied their motion to compel without prejudice.  (D.E. 29.)  After the parties completed arbitration-related discovery, Midtown filed a renewed motion to compel arbitration, which is now before the Court.[2]  (D.E. 63.)

---

[1] Midtown incorporated these documents in its motion to compel but did not attach them as exhibits.  (*See* D.E. 63-4; D.E. 63-5.)  However, Defendant asserts that these records were provided to Plaintiff subject to a confidentiality agreement, and Plaintiff has not disputed Defendant's representation of the contents of these documents.

[2] On December 22, 2020, the undersigned issued a report and recommendation denying Midtown's motion without prejudice, again, since Midtown had filed two motions "to extend deadline regarding arbitration."  (D.E. 88; D.E. 72; D.E. 73.)  On December 28, the parties filed a joint objection clarifying that all discovery related to arbitration was complete and that no further evidence would be submitted on Midtown's motion to compel.  (D.E. 91.)  Accordingly, the undersigned's December 22 report and recommendation is hereby amended by this report and recommendation.

## APPLICABLE LAW

The Federal Arbitration Act ("FAA") "allows '[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration' to seek an order compelling arbitration and permits a stay of other proceedings if claims are referred to arbitration."[3]  *McGee v. Armstrong*, 941 F.3d 859, 865 (6th Cir. 2019) (quoting 9 U.S.C. §§ 3–4) (alteration in original).  "[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019).  Because arbitration agreements are contracts, the question of whether an arbitration agreement is valid and enforceable is one of state contract law.  *Glazer v. Lehman Bros.*, 394 F.3d 444, 450 (6th Cir. 2005); *GGNSC Louisville St. Matthews LLC v. Badgett*, 728 F. App'x 436, 440 (6th Cir. 2018).  Here, the parties agree that Tennessee contract law applies.

When deciding a motion to compel arbitration and stay proceedings, a court must resolve four questions:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*McGee*, 941 F.3d at 865 (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000)) (alteration in original).  Since Plaintiff's complaint asserts only one claim, which arises under Tennessee law, the Court need not decide the third or fourth issues outlined above.  Moreover, Wendell does not dispute that the arbitration agreement, if valid and enforceable, covers the

---

[3] The parties do not dispute that the underlying arbitration agreement involves interstate commerce or that the FAA governs the agreement.

underlying dispute.  Accordingly, the undersigned turns to the issue of whether the parties entered into a valid, enforceable arbitration agreement.

## DISCUSSION

### A.  Validity of the Arbitration Agreement

Midtown asserts that the arbitration agreement is valid and enforceable against Wendell and his father's estate since Mavis had express oral authority to sign the agreement on LaFerre's behalf.  (D.E. 64 at PageID 481.)  Specifically, Defendant points to Mavis' representation in the agreement that Decedent, "while able, gave [her] oral authority to make decisions for him."  (*Id.* at PageID 484–85 (citing D.E. 63-2 at PageID 457).)  Further, Midtown avers that SHC assigned its rights and obligations under the agreement to Midtown and that the parties to this suit are bound by the agreement, as the plain language of the agreement binds all "heirs, beneficiaries, estates, estate representatives, successors, statutory wrongful death beneficiaries, and assigns."  (*Id.* at PageID 486.)

In response, Plaintiff contends that Defendant is not a party to the agreement as there is no proof that SHC specifically assigned its rights under this contract to Defendant.  (D.E. 67 at PageID 509–11.)  Wendell further submits that LaFerre's estate is not bound by the agreement since Mavis lacked authority to sign on her husband's behalf.  (*Id.* at PageID 512–17.)  Moreover, Plaintiff avers that Decedent lacked capacity to give Mavis oral authority to execute the agreement on his behalf.  (*Id.* at PageID 513–14.)  Wendell also challenges the authenticity of Mavis' signature.

In its reply, Midtown asserts that the deposition testimonies of LaFerre's children, Wendell and LaVon Harris ("LaVon"), show that LaFerre was competent, and insists that Wendell has not met his burden of proving that LaFerre was incompetent at the time he gave Mavis authority to sign the arbitration agreement.  (D.E. 68 at PageID 569–70.)

### 1. Parties to the Agreement

Plaintiff insists that Defendant is not a party to the arbitration agreement and cannot enforce it, as Defendant did not sign the agreement and is not named therein.  (D.E. 67 at PageID 509.) Midtown contends that it has standing to enforce the agreement since it is either a successor or an assignee of the agreement as a result of its transaction with SHC, and because the arbitration agreement explicitly states that "it will be upheld and enforced against our heirs, beneficiaries, estates, estate representatives, successors, statutory wrongful death beneficiaries, and assigns." (D.E. 64 at PageID 474–75; D.E. 63-2 at PageID 456.)  Specifically, Defendant points to the OTA, Bill of Sale, and Assignment and Assumption Agreement between it and SHC, and asserts that the assets assigned included "the name of the facility, the inventory, occupancy agreements, records, and contracts."  (*Id.*; *see also* D.E. 63-3 at PageID 460 (Affidavit of Simcha Hyman).)  Midtown avers that the admission and arbitration agreements clearly fall within the occupancy agreements assigned, as the Assignment Agreement broadly assigned all occupancy agreements "for use or occupancy of the facility."  (D.E. 68 at PageID 571.)

According to Wendell, the occupancy agreements SHC assigned to Midtown did not include the admission and arbitration agreements because neither the OTA nor Bill of Sale specifically referenced these agreements.  (D.E. 67 at PageID 510.)  Further, relying on the definition of "successor" in Black's Law Dictionary, Plaintiff contends that Midtown is not a successor-in-interest to the arbitration agreement since there was no merger between SHC and Midtown.  (*Id.* at PageID 511.)  Wendell insists that the fact that SHC and Midtown remain separate and distinct entities is proof that the former did not transfer "**all**" of its rights and responsibilities to the latter.  (*Id.*)

The Tennessee Court of Appeals has described the requirements of an effective assignment as follows:

> To make an effective assignment of a contractual right, the owner of that right must manifest an intention to make a present transfer of the right without further action by the owner or by the obligor. . . . No words of art are required; the assignor need not even use the word *assign*. Whether the owner of a right has manifested an intention to transfer it is a question of interpretation to be answered from all the circumstances, including words and other conduct.

*Collier v. Greenbrier Developers, LLC*, 358 S.W.3d 195, 201 (Tenn. Ct. App. 2009) (quoting E. Allan Farnsworth, *Contracts* § 11.3, p.709 (3d ed. 1999)). Further, "[a]bsent a statute to the contrary, no writing is necessary for an effective assignment." *Collier*, 358 S.W.3d at 201 n.2.

The assignment between SHC and Midtown included all occupancy agreements that SHC entered into with its residents. To become a resident at Defendant's facility, Jonathan Smith, the facility's Admissions Coordinator, testified in his deposition that execution of the admission and arbitration agreements were mandatory. (D.E. 67-1 at PageID 526–27.) And the arbitration agreement itself states, in bold font on the first page: "Please know we require all new residents and/or their legal representatives to read, agree, and sign this Agreement for admission." (D.E. 63-2 at PageID 455.) Given that all residents, including LaFerre, were required to execute the admission and arbitration agreements before they could become an occupant of the nursing home, the undersigned finds that the underlying agreement is included in the occupancy agreements assigned to Midtown. Indeed, since the purpose of the transaction between Defendant and SHC was to assign operational control of the facility to Defendant, (*see* D.E. 63-3 at PageID 460 (Affidavit of Simcha Hyman)), it would be difficult to conclude that the agreements by which the nursing home operates were not included in the assignment. Accordingly, the undersigned concludes that Midtown is a party to the arbitration agreement, as the agreement plainly binds the parties' assigns, and therefore has standing to enforce it.

6

### 2.  Mental Capacity

Plaintiff asserts that Decedent "could not have 'orally' told [Mavis] to sign any paperwork concerning his nursing home stay due to his mental infirmities."  (D.E. 67 at PageID 513.)  In support of this argument, Wendell relies on Smith's deposition testimony, LaFerre's hospital record prior to his admission to Defendant's facility, and a "mental status" interview conducted by the facility one week after LaFerre's admission.  (*Id.* at PageID 513–14.)  Plaintiff apparently contends that Decedent's diagnosis as having dementia, disorientation, confusion, and an altered mental state precluded him from having the necessary capacity to confer oral authority to Mavis.

Midtown responds that the medical records submitted by Plaintiff contain only general diagnoses and that a diagnosis of dementia is not enough to demonstrate incompetency.  (D.E. 68 at PageID 569–70.)  Further, Defendant contends that LaFerre's medical records are contradicted by Plaintiff's and LaVon's deposition testimony, which show that LaFerre was competent prior to, and at the time of, his admission to its facility and that any dementia he had was slight.  (*Id.*)  As such, Midtown submits that Wendell fails to meet his burden of demonstrating that Decedent was incompetent at the time he granted Mavis authority to sign the arbitration agreement on his behalf.

Under Tennessee law, the mental capacity required to appoint an agent is the same as that required to enter into a contract.  *Barbee v. Kindred Healthcare Operating, Inc.*, 2008 WL 4615858, at *6 (Tenn. Ct. App. Oct. 20, 2008) (citing 3 Am. Jur. 2d *Agency* § 11 (2002)) ("A person who is not in a mental condition to contract is not competent to appoint an agent for the purpose of contracting.").  "[T]he party asserting another's lack of mental capacity bears the burden of proof, and that proof must be clear, cogent, and convincing."  *Ralston v. Hobbs*, 306 S.W.3d 213, 219–20 (Tenn. Ct. App. 2009) (citations omitted).  The proof must demonstrate that

7

the individual was incompetent at the time the contract was formed, or in this case, at the time authority was conferred. *Mitchell v. Kindred Healthcare Operating, Inc.*, 349 S.W.3d 492, 501 (Tenn. Ct. App. 2008). Further, "[a]ll adults are presumed to be competent enough to enter into contracts." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 297 (Tenn. Ct. App. 2001) (citations omitted). To rebut this presumption, "[i]t is not enough to prove that a person was depressed or had senile dementia; [rather], to prove mental incapacity, the person with the burden of proof must establish, in light of all the surrounding facts and circumstances, that the cognitive impairment or disease rendered the contracting party incompetent . . . ." *Mitchell*, 349 S.W.3d at 501 (quoting *Rawlings*, 78 S.W.3d at 297) (alterations in original); *see also Ralston*, 306 S.W.3d at 220 (citing *Rawlings*, 78 S.W.3d at 297) ("[T]he mere suggestion that a person is advanced in age, forgetful or has senile dementia is insufficient to prove a lack of mental capacity.").

Turning to the above-mentioned exhibits, Plaintiff first points to Smith's deposition to show that the facility was aware of Decedent's "condition" at the time of his admission. (D.E. 67 at PageID 513 (citing D.E. 67-1 at PageID 528.) But even if the Admissions Coordinator was aware of LaFerre's condition, the question remains: what was LaFerre's condition? Smith's testimony does little to help resolve this issue as he had no recollection of meeting with Decedent or his family. (D.E. 67-1 at PageID 531–32.)

Next, Wendell relies on a copy of a "mental status" interview conducted by the nursing home seven days after LaFerre was admitted. According to the report, the facility's staff was instructed to conduct this interview with all residents, unless the resident "is rarely/never understood." (D.E. 67-5 at PageID 562.) The interview consisted of five questions. The first called for the resident to repeat three words: "sock, blue, and bed." LaFerre was able to repeat all three words on his first attempt. The next three questions concerned "temporal orientation" and

asked the resident to report the correct year, month, and day of the week.  Decedent was unable to provide the correct year and day of the week, and missed the correct month by "6 days to 1 month." The final question required the resident to recall and repeat the three words from the initial question.  LaFerre could recall only one of the words—"blue"—after receiving a cue that it was "a color."

Lastly, Plaintiff cites LaFerre's October 3, 2017 hospital record as evidence of his father's mental state one week before LaFerre was admitted to the nursing home.  The hospital report notes that the reason for Decedent's arrival was "because of a 'spell' earlier [that] evening."[4]  (D.E. 67-5 at PageID 563.)  The doctor recorded that LaFerre's present illness was an "altered mental status" with "dementia at baseline."  (*Id.*)  The report further provides that Decedent's symptoms included being "disoriented and confused," but that "[t]he degree at onset was moderate" and "[t]he degree at present is moderate."  (*Id.*)  The doctor also recorded that LaFerre appeared "alert" with "no acute distress," that his speech was normal, that he had "no altered level of consciousness," and that his condition was stable.  (*Id.* at PageID 563–64.)  According to the report, an "exacerbating factor" of Decedent's condition was that it was "worse at night."  (*Id.*)

Wendell offers no real analysis as to how these exhibits prove that LaFerre was incompetent.  Instead, he simply highlights portions of the October 3 hospital record and claims that this is proof of LaFerre's "mental infirmities."  (D.E. 67 at PageID 513, 514 n.18.)

"Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones" *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).  This is exactly what Plaintiff does here.  He presents a skeletal

---

[4] According to the hospital record, Decedent was examined at 11:09 PM, and the "onset" of his symptoms began four hours earlier.  (D.E. 67-5 at PageID 563.)

assertion that Decedent was incompetent, cites two exhibits in the record, and essentially asks the Court to examine these documents independently and draw a conclusion in his favor. The undersigned declines to flesh out this issue for Wendell. Accordingly, the undersigned finds that Plaintiff does not seriously intend to pursue this argument, as his bare assertion that LaFerre was incompetent is not accompanied by any effort at developed argumentation.[5]

---

[5] Notwithstanding Wendell's failure to present an argument on this point, the undersigned finds that the record does not contain clear and convincing proof that Decedent was incompetent at the time he gave Mavis authority to sign the underlying agreement on his behalf. LaVon repeatedly testified during her deposition that her father had "a very good mind" and "a very sharp mind," could carry on a conversation, and that she talked with her father every night while he was in the nursing home. (D.E. 68-3 at PageID 591, 594–95.) According to LaVon, LaFerre's primary challenges were mobility and hearing. (*Id.* at PageID 594–95.) When asked whether her father understood who she was, LaVon responded, "absolutely." (*Id.* at PageID 599.) She testified further that LaFerre "was talking all the time," that "[a] lot of things he said amazed [her], a lot of things," and that "whatever kind of dementia he had, it was very light." (*Id.*) LaVon also stated that, based on "the way [her] dad was talking," she believed "he could pretty much made [sic] his own decision." (*Id.* at PageID 604.) Additionally, LaVon's testimony reveals that Decedent was well aware of the possibility that he might be placed in a nursing home. (*See id.* at PageID 595–97.)

During Plaintiff's deposition, he agreed that his father had a sharp mind and was even "very sharp in certain areas." (D.E. 68-4 at PageID 614.) Wendell testified that LaFerre was "very talkative," would joke and laugh, and "was a cutup." (*Id.*) Plaintiff recalled that Decedent knew who Plaintiff was and that "[Decedent] knew who [Decedent] was," but that "[t]here were times that he would not remember certain people." (*Id.*) Further, Wendell testified that his father did not wear a watch and "may not have known the day of the week" but could recall events. (*Id.*) When asked whether LaFerre could tell others what he wanted or needed, Plaintiff responded in the affirmative and testified that LaFerre would follow up with you the next day if you did not bring him what he asked for or do something you were supposed to do. (*Id.*) For example, Wendell testified that he and one of his sisters, Linda Harris, were visiting Decedent one day and Linda told Decedent that she would return later that night. When Linda did not return until the next day, LaFerre asked, "what happened to you yesterday, you were supposed to come back last night." (*Id.*)

At most, the evidence in the record shows that Decedent suffered from a moderate degree of dementia, which was exacerbated at night. As noted above, however, proof that a person was diagnosed with dementia is insufficient to prove that he or she was incompetent. *Mitchell*, 349 S.W.3d at 501; *Rawlings*, 78 S.W.3d at 297. Further, the testimony of LaFerre's children supports a finding that LaFerre was mentally competent, as he could recall recent and past events, was aware of his surroundings, and had strong communication skills. Accordingly, after considering all the evidence in the record, the undersigned concludes that Plaintiff fails to show by clear, cogent, and convincing proof that Decedent was incompetent at the time he conferred authority to Mavis to sign the arbitration agreement on his behalf.

### 3.  Actual Authority

"When an agency relationship exists, the principal may be bound by the acts of the agent performed on the principal's behalf and within the actual or apparent scope of the agency." *Boren ex rel. Boren v. Weeks*, 251 S.W.3d 426, 432 (Tenn. 2008).  "The proponent of an arbitration agreement has the burden of establishing the agent's authority to bind the principal." *Manley v. Humboldt Nursing Home, Inc.*, 2020 WL 5587721, at *3 (Tenn. Ct. App. Sept. 18, 2020).  Under Tennessee law, there are three types of authority an agent may possess:  (1) express actual authority; (2) implied actual authority; or (3) apparent authority.  *Milliken Group, Inc. v. Hays Nissan, Inc.*, 86 S.W.3d 564, 567 (Tenn. Ct. App. 2001).  As to the first, "[a] principal may expressly give actual authority to the agent in direct terms, either orally or in writing."  *Hall v. Haynes*, 319 S.W.3d 564, 573 (Tenn. 2010) (citation omitted); *see also Milliken Group, Inc.*, 86 S.W.3d at 567 ("Actual authority flows from the manifestations of the principal to the agent."). "If an agent acts with actual authority, then he may bind the principal in contract *regardless of whether the third party is actually aware of that authority at the time of the transaction*."  *Id.* (emphasis added) (citing *McConnico v. Third Nat'l Bank*, 499 S.W.2d 874, 883 (Tenn. 1973)).

In contrast, implied actual authority "embraces all powers which are necessary to carry into effect the granted power, in order to make effectual the purpose of the agency." *Hall*, 319 S.W.3d at 573 (quoting *Rubio v. Precision Aerodynamics, Inc.*, 232 S.W.3d 738, 743 (Tenn. Ct. App. 2006)).  Unlike express authority, implied authority "must be predicated on some act or acquiescence of the principal, rather than the actions of the agent." *Id.* (citation and internal quotation marks omitted).  Similar to implied authority, "apparent authority must be established through the acts of the principal rather than those of the agent." *Mechs. Laundry Serv. v. Auto Glass Co. of Memphis*, 98 S.W.3d 151, 157 (Tenn. Ct. App. 2002) (citation omitted).

It appears that Plaintiff conflates these different theories of authority, as he insists that Defendant cannot rely on Mavis' statement alone but rather must point to some act or statement by LaFerre to prove that Mavis had authority to sign the arbitration agreement on his behalf.[6] The undersigned disagrees. In *Necessary v. Life Care Ctrs. of Am., Inc.*, the agent gave deposition testimony that she "had her husband's oral express authority to sign all paperwork necessary for his admission to the facility." 2007 WL 3446636, at *1 (Tenn. Ct. App. Nov. 16, 2007). The plaintiff argued that, despite receiving express authority from her husband to sign all of the admission documents, she did not have authority to sign the arbitration agreement on his behalf since she never told him about the agreement and he never saw it. *Id.* at *3, *5. The Tennessee Court of Appeals disagreed and concluded that the wife's testimony was sufficient to show that she had actual authority to execute the arbitration agreement on her husband's behalf. *Id.* at *5.

Similarly, in *Watson v. Quince Nursing & Rehab. Ctr., LLC*, the agent testified during his deposition that his mother gave him "permission to sign everything on her behalf" for her admission to the defendant's nursing home. 2019 WL 6877897, at *1 (Tenn. Ct. App. Dec. 17, 2019). On appeal, the plaintiff conceded that the agent had express authority to execute the admission documents, but argued that this authority did not extend to executing a stand-alone arbitration agreement that was not required for admission. *Id.* at *4. Again, the Tennessee Court of Appeals rejected this argument and held that the son's testimony was sufficient to show that he had express actual authority to execute the arbitration agreement on his mother's behalf. *Id.* at *5.

---

[6] In support of this position, Plaintiff relies on *Farmer v. South Parkway Assocs., L.P.*, 2013 WL 5424653 (Tenn. Ct. App. Sept. 25, 2013), and *Blackmon v. L.P. Pigeon Forge, LLC*, 2011 WL 9031313 (Tenn. Ct. App. Aug. 25, 2011). (D.E. 67 at PageID 512.) Plaintiff's reliance on these cases is misplaced, as *Farmer* addressed only implied and apparent authority since the parties conceded that the putative agent did not have express authority, and *Blackmon* concerned a putative agent's scope of authority pursuant to a power of attorney.

The upshot of *Necessary* and *Watson* is that each agent's express authority was established through their own deposition testimony.

Here, Midtown relies on the fact that Mavis represented in the arbitration agreement that LaFerre, "while able, gave [her] oral authority to make decisions for him." (D.E. 63-2 at PageID 457.) As in *Necessary* and *Watson*, this is sufficient to show that Mavis had express authority to sign the arbitration agreement on her husband's behalf. Plaintiff attempts to escape this conclusion by arguing that it is improper for Defendant to rely on this "self-serving" statement in the agreement. (D.E. 67 at PageID 514–15.) Midtown points out, however, that Wendell's counsel refused its request to depose Mavis, citing health concerns.[7] (D.E. 68-1.) As such, Defendant contends that Plaintiff should not be permitted to disavow Mavis' prior representation. The undersigned agrees. The only distinction between Mavis' statement and the agents' assertions in *Necessary* and *Watson* is that the latter resulted from deposition testimonies. But that is merely a distinction without a difference, particularly in light of the fact that Midtown was not afforded the opportunity to depose LaFerre's wife.

Wendell further avers that Smith's inability to recall whether Mavis told him that she had authority to sign for Decedent is proof that she lacked the requisite authority. (D.E. 67 at PageID 513–15.) Smith's lack of memory, however, does not contradict Mavis' representation that she received oral authority to make decisions on LaFerre's behalf.

Lastly, Plaintiff relies on LaVon's deposition testimony as evidence that Mavis lacked authority. (*Id.* at PageID 514.) During her deposition, LaVon stated that her father did not trust his wife because she was not a "business-minded person." (D.E. 68-3 at PageID 592.) But this does not contradict Midtown's proof that Mavis received express oral authority from LaFerre.

---

[7] Defendant's attempt to depose Mavis occurred prior to the outbreak of the COVID-19 pandemic.

Indeed, Wendell ignores the fact that LaVon also testified that she was not involved in her father's admission to Defendant's facility. (*Id.* at PageID 592, 596.) Put differently, LaVon has no personal knowledge of the circumstances surrounding the execution of the arbitration agreement. And the evidence in the record reveals that only Mavis was involved in LaFerre's admission. (*See* D.E. 68-3 at PageID 592, 596; D.E. 68-4 at PageID 610–612.)

Accordingly, the undersigned concludes that the evidence in the record preponderates in favor of a finding that Mavis possessed express actual authority to execute the arbitration agreement on her husband's behalf.

### 4.  Authenticity of Mavis' Electronic Signature

Next, Plaintiff asserts that Mavis' electronic signature and initials on the arbitration agreement have not been authenticated and that there is "no actual proof" that Mavis signed the agreement herself. (D.E. 67 at PageID 504, 515 n.19.) "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Wendell insists that none of the witnesses deposed could confirm that Mavis actually signed the agreement. Relying on Smith's deposition testimony, Plaintiff avers that the agreement was executed via email. (*Id.* at PageID 515 n.19.) And based on LaVon's testimony, Wendell submits that Mavis could not have been the person who signed the agreement since she did not have an email account. (*Id*; D.E. 67-2 at PageID 544–55; D.E. 68-3 at PageID 597.) According to Plaintiff, the admission paperwork could have been emailed to LaVon, and she may have signed the underlying agreement.

Wendell's assertion that LaVon may have signed the arbitration agreement is without merit. As Midtown points out, Plaintiff ignores the fact that LaVon testified that she was not involved in her father's admission process. (D.E. 68 at PageID 569 n.1; D.E. 68-3 at PageID 592,

596.)  LaVon further testified that her mother was the only person involved in getting LaFerre admitted to the nursing home.  (D.E. 68-3 at PageID 592, 596.)  Thus, there is no support for Wendell's contention that LaVon signed the arbitration agreement.  Rather, the proof is to the contrary.

Further, Smith did not testify that he emailed the admission paperwork to Mavis.  He stated that he could not recall the manner in which Mavis executed the paperwork, but that it was either sent by email or completed in person using a computer tablet.[8]  (D.E. 68-2 at PageID 579.)  The Admissions Coordinator also testified that before someone could submit the admission paperwork, including the arbitration agreement, a message would appear asking the person to certify that they are the person whose signature appears on the agreement.  (D.E. 68-2 at PageID 584.)  Moreover, LaVon testified that her mother went to Defendant's facility "a couple times" by herself to sign the admission documents.  (D.E. 68-3 at PageID 592, 602–03.)  Given that Mavis did not have an email account, that she traveled to the nursing home at least twice—presumably to complete paperwork—and that neither LaVon nor Plaintiff was involved in the admission process, the undersigned finds that Mavis more likely than not signed the arbitration agreement at the facility using the computer tablet provided.  Indeed, there is nothing in the record to suggest that anyone other than Mavis signed the underlying agreement.  Accordingly, the undersigned finds that Midtown has offered sufficient evidence to prove the authenticity of Mavis' signature on the arbitration agreement.[9]

---

[8] Smith also testified that, although he could not specifically recall meeting with Mavis, the fact that a "5" was entered in the second blank under Paragraph 11(a) indicated to him that he spoke with Mavis because this response was optional and he would record the response in "years."  (D.E. 68-2 at PageID 581.)

[9] The undersigned notes that Wendell's assertions that none of the witnesses deposed could confirm the authenticity of Mavis' signature and that there is "no actual proof" that Mavis signed the agreement are unpersuasive.  First, as discussed above, the deposition testimonies of LaVon

### B. Enforceability of the Arbitration Agreement

Turning to the enforceability of the underlying agreement, Wendell asserts that the arbitration agreement is unenforceable because it is an unconscionable contract of adhesion. (D.E. 67 at PageID 519.) Tennessee courts employ a two-step inquiry to determine whether an arbitration agreement is unenforceable. First, the court must determine whether the underlying agreement is a contract of adhesion. *Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996). If so, the next question is whether the agreement contains "such unconscionable or oppressive terms as to render [it] unenforceable." *Id.*

A contract of adhesion is defined as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." *Id.* (quoting Black's Law Dictionary 40 (6th ed. 1990)). "The distinctive feature of a contract of adhesion is that the weaker party has no realistic choice as to its terms." *Id.* (alteration in original) (citation omitted).

Plaintiff asserts that the arbitration agreement is a contract of adhesion because it is a standardized contract and was offered on a "take it or leave it" basis, as signing the agreement was required for admission. (D.E. 67 at PageID 519.) Wendell further contends that there is no evidence that the parties bargained over the terms of the agreement. (*Id.*) Defendant does not

---

and Smith each weigh in favor of a finding that Mavis signed the arbitration agreement. While there may be no *direct* evidence that Mavis signed the arbitration agreement, there is "actual proof"—in the form of circumstantial evidence—that she did. And circumstantial evidence is sufficient to prove an exhibit's authenticity. *United States v. Crosgrove*, 637 F.3d 646, 658 (6th Cir. 2011). Further, as Defendant points out, one reason for the lack of testimony concerning Mavis' execution of the agreement is due to the fact that Plaintiff's counsel prevented Defendant from deposing Mavis. The undersigned agrees with Midtown that Wendell should not be permitted to take advantage of the absence of testimony from Mavis as proof that she did not sign the agreement.

directly address whether the underlying agreement is a contract of adhesion, but appears to argue that it is not since the agreement allowed LaFerre to cancel or revoke the agreement within thirty days.  (D.E. 68 at PageID 572.)

The undersigned agrees with Plaintiff that the underlying arbitration agreement is a standardized contract, as the same document is provided to each resident and was drafted by the facility—i.e., "the contracting party with superior knowledge of the subject matter." *Buraczynski*, 919 S.W.2d at 320.  Additionally, the agreement was offered on a "take it or leave it" basis, as the document plainly states that signing it was required for admission.  (D.E. 63-2 at PageID 455.) *Cf. Estate of Mooring v. Kindred Nursing Ctrs.*, 2009 WL 130184, at \*5 (Tenn. Ct. App. Jan. 20, 2009) (concluding that an optional arbitration agreement was not a contract of adhesion).  Smith's deposition testimony further confirms that assenting to the agreement was a prerequisite for residency.  (D.E. 67-1 at PageID 526–27.)  As such, the undersigned finds that the underlying agreement is a contract of adhesion.

An adhesion contract, however, "is not automatically unenforceable." *Estate of Mooring*, 2009 WL 130184, at \*4; *Buraczynski*, 919 S.W.2d at 320.  The enforceability of such contracts "generally depends upon whether the terms of the contract are beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable." *Buraczynski*, 919 S.W.2d at 320; *see also Philpot v. Tennessee Health Mgmt., Inc.*, 279 S.W.3d 573, 579 (Tenn. Ct. App. 2007) ("Adhesion contracts that are oppressive to the weaker party or limit the obligations and liability of the stronger party will not be enforced by the courts.").  Tennessee courts analyze unconscionability in two parts:  "(1) procedural unconscionability, which is an absence of the meaningful choice on the part of one of the parties[,] and (2) substantive unconscionability, which refers to contract terms which are unreasonably favorable to the other party." *Philpot*, 279 S.W.3d

at 579 (citation omitted).  "A contract will be found to be unconscionable only when the 'inequality of the bargain is so manifest as to shock the judgment of a person of common sense, *and* where the terms are so oppressive that no reasonable person would make them on one hand, and no honest and fair person would accept them on the other.'"  *Id.* (quoting *Taylor v. Butler*, 142 S.W.3d 277, 285 (Tenn. 2004)) (emphasis added).

Wendell does not address any of the terms in the agreement but rather avers that the circumstances surrounding Mavis' execution of the admission paperwork "deprived her of 'meaningful choice' rendering the Arbitration Agreement unconscionable."  (D.E. 67 at PageID 521.)  As explained above, an inequality of bargaining power or the absence of meaningful choice is not enough to render an agreement unconscionable; the terms of the agreement must also unreasonably favor the dominant party or oppress the weaker party.  Moreover, Plaintiff fails to delineate the circumstances surrounding Mavis' execution of the agreement that purportedly render it unconscionable.

Midtown contends that the agreement is not unconscionable or oppressive, as the terms treat both sides equally, do not limit the facility's liability, and allowed Decedent to cancel or revoke the agreement within thirty days.  (D.E. 64 at PageID 488.)  Defendant further asserts that the arbitration agreement here is comparable to the one in *Buraczynski* and, therefore, should be enforced.  (*Id.* at PageID 487–88.)

In *Buraczynski*, the Tennessee Supreme Court examined whether two physician-patient arbitration agreements, which were contracts of adhesion, were unconscionable and provided several factors for courts to consider, including:  (1) whether the agreement to arbitration is a separate agreement or instead contained within another contract; (2) whether the agreement includes a "short explanation" encouraging patients to ask questions about the agreement;

(3) whether the superior party is given an unfair advantage in the arbitration process itself; (4) the manner in which the patient was informed about waiving their right to a jury trial—*e.g.*, the font size, font type, ink color, capital letters; (5) whether the terms of the agreement are "laid out clearly" or buried; (6) whether the patient could revoke the agreement and regain the right to a trial by jury; and, "perhaps most importantly," (7) whether the agreement limits the stronger party's responsibilities and liability or "merely shift[s] the disputes to a different forum."[10] *Buraczynski*, 919 S.W.2d at 320–21. Additionally, the Tennessee Court of Appeals has looked to whether the agreement contains a short explanation about how arbitration works. *Raiteri v. NHC Healthcare/Knoxville, Inc.*, 2003 WL 23094413, at *8 (Tenn. Ct. App. Dec. 30, 2003).

After reviewing the arbitration agreement in this case, the undersigned finds that it does not contain any oppressive or unconscionable terms and is not outside the reasonable expectations of the parties. The agreement is a separate, three-page document entitled "**AGREEMENT TO INFORMALLY RESOLVE AND ARBITRATE ALL DISPUTES**." (D.E. 63-2 at PageID 455.) Above the signature line on the third page, the agreement states in bold, capital letters: "**I HAVE READ THIS DOCUMENT, UNDERSTAND IT, HAVE HAD THE CHANCE TO ASK QUESTIONS, AND ACKNOWLEDGE MY RIGHT TO SPEAK WITH AN ATTORNEY ABOUT THIS**." (*Id.* at PageID 457.) Further, the agreement provides a clear and

---

[10] In analyzing the arbitration agreements in *Buraczynski*, the Tennessee Supreme Court noted that it (1) was a separate document, entitled "Physician-Patient Arbitration Agreement"; (2) contained a short explanation encouraging the patient to ask questions; (3) gave no unfair advantage to the physician in the arbitration process, as each side was allowed to choose an arbitrator and the two arbitrators would then appoint a third arbitrator, and as both sides were bound by the arbitrator's decision; (4) clearly informed the patient about waiving their right to a jury trial by "a provision in ten-point capital letter red type, directly above the signature line"; (5) contained no buried terms; (6) allowed the patient to revoke the agreement within thirty days of its execution; and (7) did not change the doctor's duty to use reasonable care or limit liability for a breach of that duty. *Buraczynski*, 919 S.W.3d at 321. The *Buraczynski* court held that the agreement was enforceable and even emphasized that "[n]one of the above described provisions can be construed as unconscionable, oppressive, or outside the reasonable expectations of the parties." *Id.*

detailed explanation of how the three-step dispute resolution procedure/arbitration works.  For example, it informs the resident of what types of claims are subject to the agreement, how to initiate the dispute resolution process, what law and rules will apply, that the arbitrator may award either party "the same damages as a court could," that the arbitrator's decision "will be **FINAL**," and how the arbitrator will be selected.  (*Id.* at PageID 455–56.)

Moreover, the terms of the agreement do not give Midtown an advantage in the arbitration process itself or otherwise.  If informal resolution and mediation are unsuccessful, each party is required to submit their claim(s) to arbitration—there is no exception for Defendant. *Cf. McGregor v. Christian Care Ctr. of Springfield, L.L.C.*, 2010 WL 1730131, at *6 (Tenn. Ct. App. Apr. 29, 2010) (arbitration agreement included exception allowing the facility to bring claims regarding nonpayment in "a court of law").  The agreement does not limit Defendant's liability or duty of care, and the parties are bound by the arbitrator's decision.  Further, both parties must "discuss and agree" on who the arbitrator will be, and if they cannot agree, each may nominate their own arbitrator candidate and the candidates, together, will agree upon an arbitrator.  (D.E. 63-2 at PageID 456.)  *Cf. Raiteri*, 2003 WL 23094413, at *8 (nursing home solely responsible for choosing arbitrator).  Additionally, the contract provides, in a stand-alone paragraph printed in bold and italicized, that either party may revoke or cancel the agreement via written notice within thirty days after the date of execution.  (D.E. 63-2 at PageID 456.)

Finally, the terms of the agreement, particularly as to waiving the right to a jury trial and binding the parties' successors, are laid out clearly.  The arbitration agreement is three pages long. It is broken down into eleven paragraphs, each dealing with a separate issue, and none of the paragraphs run onto another page.  The provision containing the waiver of the right to a jury trial

is printed on the first page in capital letters, bold font, and is underlined.[11]  (D.E. 63-2 at PageID

455.)  This term of the agreement stands out clearly, as the surrounding language is printed in

lowercase letters and regular font.  The provision stating that the agreement binds the parties'

successors is also laid out plainly.  Although this term is not in bold font or otherwise highlighted,

it is provided in a stand-alone paragraph and is by no means buried in the agreement.  It is also

written in plain language and unmistakably conveys that the resident's and the facility's "heirs,

beneficiaries, estates, estate representatives, successors, statutory wrongful death beneficiaries,

and assigns" will be bound by the agreement.  (*Id.* at PageID 456.)

Like the arbitration agreement in *Buraczynski*, the undersigned finds that "[n]one of the

above described provisions can be construed as unconscionable, oppressive, or outside the

reasonable expectations of the parties."  919 S.W.2d at 321.  Accordingly, the undersigned

concludes that the agreement is enforceable against Plaintiff.[12]

---

[11] The waiver provision reads:  "**THIS MEANS THAT NO ONE WILL FILE A LAWSUIT
AGAINST THE OTHER, AND THAT EACH PARTY IS GIVING UP, OR WAIVING,
THE RIGHT TO FILE A LAWSUIT AND HAVE A JUDGE OR A JURY DECIDE THE
DISPUTE AND/OR ANY ISSUES ABOUT THIS AGREEMENT**."  Additionally, there are
two sentences after the waiver that further explain to what the resident is agreeing:  "This also
means we agree to completely avoid the court system and that we do not want a judge or jury
deciding any part of our dispute.  We can still talk about our dispute, however, with any federal or
state agency, outside the court system."  (D.E. 63-2 at PageID 455.)

[12] In a last-ditch effort to avoid enforcement of the agreement, Plaintiff contends that the arbitration
agreement should not be enforced because it violates 42 C.F.R. § 483.70(n)(1), which prohibits
long-term care facilities from requiring residents to sign arbitration agreements "as a condition of
admission to, or as a requirement to continue to receive care at, the facility."  (D.E. 67 at PageID
521.)  This regulation, however, did not go into effect until September 16, 2019—nearly two years
after the underlying agreement was signed—and Wendell offers no explanation as to why it should
be enforced retroactively against Midtown.  Plaintiff's only argument on this point is that "there
is no indication in the regulation that its prohibitions do not apply . . . when the enforcement of the
agreement is sought following the effective date of the regulation."  (*Id.* at PageID 506 n.9.)  Put
differently, Wendell avers that the regulation should apply retroactively since it does not expressly
preclude retroactive effect.  This argument fails for at least two reasons.  First, there is a
presumption against retroactive legislation, and "congressional enactments . . . will not be
construed to have retroactive effect unless their language requires this result."  *INS v. St. Cyr*, 533

## RECOMMENDATION

For the reasons above, the undersigned RECOMMENDS that Defendant's motion to compel arbitration be GRANTED, and that this action be STAYED pending resolution of the arbitration.

Respectfully submitted this 19th day of March 2021.

s/ Jon A. York_____
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT AND RECOMMENDATION MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDATION.  *SEE* 28 U.S.C. § 636(b)(1)(C); LOCAL RULE 72(g)(2).  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**

---

U.S. 289, 315–16 (2001).  Plaintiff fails to mount an argument rebutting this presumption.  Second, Wendell initiated this lawsuit roughly three months before the above regulation went into effect, and Defendant moved to compel arbitration two months before the regulation's effective date.  Thus, applying Plaintiff's own standard, this regulation is inapplicable since the enforcement of the underlying agreement was sought prior to the effective date of the regulation.